**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 22-35-CJS**

**HEATHER BRESSLER, et al.**                                    **PLAINTIFFS**

**v.**                **MEMORANDUM OPINION AND ORDER**

**ZACHARY LUSK, et al.**                                        **DEFENDANTS**

\*\*\*  \*\*\*  \*\*\*  \*\*\*

Plaintiff Heather Bressler brought this action individually, as a representative of her deceased husband's estate, and as custodian and legal guardian of her three minor children, alleging that Defendants Kentucky State Police Troopers Zachary Lusk and Douglas Holt are liable under 42 U.S.C. § 1983 and Kentucky state law for fatally shooting her husband, Gary Bressler, outside of their home.  Before the Court is Defendants' Motion for Summary Judgment (R. 53), which has been fully briefed (R. 56; R. 61).  For the reasons that follow, Defendants' Motion for Summary Judgment (R. 53) will **be granted in part** and **denied in part**.

I.      **BACKGROUND**

    A.      **Factual Background**

In the early morning hours of November 3, 2021, Troopers Douglas Holt ("Trooper Holt") and Zachary Lusk ("Trooper Lusk") (collectively "Defendants" or "Troopers") responded to a 911 call at the Bressler residence, which response ended with Gary Bressler being fatally shot.[1]  Neither Trooper was outfitted with body-worn camera, nor were their cruisers fitted with dashboard

---

[1] For purposes of this opinion, the Court refers to Plaintiff Heather Bressler as "Plaintiff," and the decedent, Gary Bressler, as "Bressler."

cameras.  And the only witnesses to the incident tell different stories as to what occurred.  The factual recitation herein is based primarily on the investigatory interviews conducted in the aftermath of the incident, deposition testimony taken during discovery, and affidavits submitted with the filings.[2]

Unless indicated otherwise, the following facts are undisputed.  (*See* R. 53-1, Defendants' Motion for Summary Judgment at Page ID 312-13; R. 58, Plaintiff's Response at Page ID 433-36; R. 61, Defendants' Reply at Page ID 813-16).  At around 1:30 a.m. on November 3, 2021, Bressler called 911 and requested law enforcement to respond to his residence in Williamstown, Kentucky.  (R. 58-18).  He refused to explain why he needed law enforcement and then hung up.  (*Id.*).  At the time the call came in, Trooper Holt was in the dispatch room at Post #6 in Dry Ridge, Kentucky;

---

[2] For context, the Court recounts some of the exhibits submitted by each party in connection with the instant summary judgment motion.  Sergeant Brent Sparks, a member of Kentucky's Critical Incident Response Team ("CIRT"), prepared an investigatory report (*see* R. 58-9, CIRT Report), which was later supplemented by a report prepared by Detective Todd Butler, also a CIRT member (*see* R. 58-10, Supplementary Report).  Both the CIRT Report and the Supplementary Report were prepared in the immediate aftermath of the incident.  The CIRT Report includes, among other things, transcribed interviews between the CIRT investigators and Plaintiff.  The Supplementary Report consists of photographs and digital scans of the scene (including aerial photos).  (*See* R. 58-10).  The CIRT interviews of the Troopers were not included in the CIRT Report.  (*See* R. 58-9 at Page ID 635) (noting that a verbatim transcription of the interviews "can be located in the narrative of Sergeant Howard's investigation").  Instead, the Troopers provided a copy of their respective CIRT interviews as attachments to their Affidavits.  (*See* R. 53-2, Holt Aff.; R. 53-3, Lusk Aff.).  The Affidavits themselves simply incorporate the Troopers' CIRT interviews by reference.  During their respective CIRT interviews, the Troopers each created a diagram of the events by marking locations and movements on an aerial photograph of the scene.  (*See* R. 58-2, Holt Diagram; R. 58-3, Lusk Diagram).  Plaintiff has provided the dispatch records from the Post #6 location that received the 911 calls.  (*See* R. 58-18, Dispatch Call Record).  Several individuals have provided deposition testimony, including Plaintiff, Trooper Holt, Trooper Lusk, Chris Johnson (a responding EMT), Jonathan Williams (a responding paramedic), and Doctor Sarah Maines (the forensic pathologist who conducted Bressler's autopsy).  (R. 58-20, Heather Dep.; R. 58-1, Holt Dep.; R. 58-8, Lusk Dep.; R. 58-12, Johnson Dep.; R. 58-13, Williams Dep.; R. 58-15, Dr. Maines Dep.).  Dr. Maines also prepared a postmortem examination report.  (R. 58-14, Autopsy Report).  Plaintiff and three of the children who allegedly witnessed the events provided Affidavits recounting their memory of the incident.  (*See* R. 58-4, Heather Aff.; R. 58-5, Child 1 Aff.; R. 58-6, Child 2 Aff.; R. 58-7, Child 3 Aff.).  The three Bressler children involved in this action were minors at the time of the incident and remain minors at the time of this Memorandum Opinion & Order.  Therefore, the Court refers to them anonymously.  Plaintiff retained a police-practices expert, Timothy J. Longo, Sr., who has prepared a report.  (*See* R. 58-19, Longo Expert Report).

Trooper Lusk was out on patrol.  (R. 53-2 at Page ID 352; R. 53-3 at Page ID 398; R. 58-1 at Page ID 468; R. R. 58-8 at Page ID 499).  Trooper Holt overheard the brief conversation between Bressler and the dispatcher.  (R. 53-2 at Page ID 352, 358; R. 58-1 at Page ID 468).  Trooper Holt agreed to respond to the call and immediately left dispatch.  (R. 53-2 at Page ID 353, 358).  From dispatch to the Bressler residence was about a 20-minute drive.  (*Id*.; R. 58-1 at Page ID 469).  Trooper Lusk also agreed to respond to the scene, but he was farther away from the Bressler residence than Trooper Holt.  (R. 53-3 at Page ID 398; R. 58-8 at Page ID 500).

Trooper Holt proceeded to the Bressler home in his marked police cruiser without activating his emergency lights or sirens.  (R. 53-2 at Page ID 353, 359-60).  He stated in a subsequent interview that he did not activate his emergency lights or sirens because he did not believe there was a threat to human life based on the 911 call.  (*Id*.).  While the Troopers were in route, Plaintiff called 911 and informed the dispatcher that Bressler was depressed, had recently lost his job, and had been drinking.  (R. 53-2 at Page ID 353; R. 58-18 at Page ID 771).  She also informed dispatch that Bressler was in the front yard with a sword, but she clarified that he had not been violent or threatening toward the family.  (R. 53-2 at Page ID 353; R. 58-18 at Page ID 771).  The dispatcher provided these updates to the Troopers.  (R. 53-2 at Page ID 353; R. 58-18 at Page ID 771).[3]

---

[3] There is some indication in the record that, in addition to these updates, Plaintiff told the dispatcher that Bressler may have been experiencing some type of mental or emotional breakdown, which information was then allegedly provided to the Troopers.  The Dispatch Call Records indicate that approximately five minutes after Bressler hung up, a "[f]emale called and adv[ised] that he is losing it."  (R. 58-18 at Page ID 771).  During her investigatory interview in the immediate aftermath of the shooting, Plaintiff stated that she did not call 911.  (*See* R. 58-9 at Page ID 562-63).  However, she later testified that she did in fact make a separate 911 call but that she did not remember what was said.  (*See* R. 58-20 at Page ID 827).  In his interview, Trooper Holt recalled Plaintiff telling dispatch that Bressler "was goin' through a lot."  (R. 53-2 at Page ID 353).  Trooper Holt later testified as follows:

> Q.    So you learned on your way to the Bressler house that Heather called and said that he had lost it, right?
> A.    It's been a while, but I don't remember the exact statement she made. But to my knowledge, I don't know if, lost it, was the term she used, but she talked about how he had lost his job and he was depressed and drinking and stuff like that.

With mention of a weapon, the Troopers agreed to arrive at the scene around the same time. (R. 53-2 at Page ID 353; R. 53-3 at Page ID 398, 402; R. 58-1 at Page ID 469; R. 58-8 at Page ID 499-500).   Trooper Holt arrived at the scene before Trooper Lusk and parked his vehicle down the street.   Trooper Holt later testified that he rolled down his window while waiting and could hear Bressler and Plaintiff talking but that there did not appear to be an immediate danger at that time. (R. 58-1 at Page ID 470).   Once Trooper Lusk indicated that he was within a half mile of the residence, Trooper Holt approached the home in his marked police cruiser.[4]

The Bressler residence is located on the north side of a two-lane, rural road that runs west-east.   (*See* R. 58-9 at Page ID 522).   Trooper Holt approached from the east, with the residence located on his right.   (R. 53-2 at Page ID 354; R. 58-1 at Page ID 470).   When Trooper Holt approached the residence, Plaintiff and Bressler were standing in the front yard, Bressler with sword in hand.   (R. 53-2 at Page ID 354; R. 58-1 at Page ID 470; *see* R. 58 at Page ID 435).   Trooper Holt pulled past the residence, parked his cruiser in the westward lane, and then exited the vehicle.   (R. 53-2 at Page ID 354; R. 58-1 at Page ID 470).   Bressler, without saying a word, began to walk toward Trooper Holt's cruiser.   (R. 53-2 at Page ID 354; R. 58-1 at Page ID 470).[5]   As Trooper Holt

---

(R. 58-1 at Page ID 468).  In his interview, Trooper Lusk recalled Plaintiff telling dispatch that Bressler "was out of it." (R. 53-3 at Page ID 398).  Trooper Lusk later testified that he did not recall being told that Bressler "had lost it." (R. 58-8 at Page ID 499).

[4] Plaintiff claims in her Response that Trooper Holt initially pulled over "a few yards" from the Bressler house.  (R. 58 at Page ID 435).  Plaintiff does not provide a record citation for that supposed distance. In his CIRT interview, Trooper Holt stated that he was less than half a mile, "maybe 2,300 feet," away from the Bressler residence when he was waiting for Trooper Lusk.  (R. 53-2 at Page ID 368).  He later testified that he was "less than half a mile" from the residence and agreed that it may have been a "few *hundred* yards." (R. 58-1 at Page ID 470) (emphasis added).  More to the point, under Plaintiff's own version of the events, Bressler did not see the cruiser until Trooper Holt actually approached the residence.  (*See* R. 58 at Page ID 435).  And the record is devoid of any mention that Plaintiff saw Trooper Holt before he approached the residence.

[5] The parties do not dispute the manner in which Bressler walked toward the cruisers.  In his CIRT interview, Trooper Holt said that Bressler's walk was neither brisk, nor slow; he just had a "continual pace." (R. 53-2 at Page ID 371-72).  Trooper Holt confirmed in his deposition that it was a steady walk.  (R. 58-1

4

exited his vehicle, Trooper Lusk arrived on the scene, parked his cruiser in the eastward lane adjacent to Trooper Holt's, and then exited the vehicle.  (R. 53-3 at Page ID 398-99; R. 58-8 at Page ID 500-01).  The Troopers drew their weapons and commanded Bressler to halt and to drop the sword.  (R. 53-2 at Page ID 354-55; R. 53-3 at Page ID 399; R. 58-1 at Page ID 471; R. 58-8 at Page ID 502).  Trooper Holt fired a single round and Trooper Lusk fired six shots in rapid succession. (R. 53-2 at Page ID 355-56; R. 53-3 at Page ID 399, 405, 413; R. 58-1 at Page ID 473-74; R. 58-8 at Page ID 504-05).

The parties agree that the events unfolded quickly.  (R. 53-3 at Page ID 405; R. 58-1 at Page ID 472; R. 58-8 at Page ID 502; *see* R. 58 at Page ID 435).  The parties disagree, however, on several key details.

Defendants contend that the Bressler children were not present to witness the incident.  (*See* R. 61 at Page ID 813, 816).  Plaintiff initially stated in her CIRT interview the same day as the incident that the kids were inside the residence sleeping and that the gunfire woke them up.  (R. 58-9 at Page ID 572).  She later told the CIRT officers that her children did in fact witness the incident. (*See id*. at Page ID 638).  The investigating officers interviewed four of the Bressler children who allegedly witnessed the incident.  (*See id*. at Page ID 639-40).  Those interviews were not included in the CIRT Report.  (*See id*.).  Plaintiff later testified that the kids were in the yard at the time of the shooting and that she did not realize they were outside when she first spoke to the investigating officers.  (R. 58-20 at Page ID 827).[6]  Trooper Holt stated in his CIRT interview that "three children"

---

at Page ID 472).  Similarly, Trooper Lusk stated in his CIRT interview that it was less of a run and more of a "steady walk."  (R 53-3 at Page ID 404).

[6] Defendants briefly argue that Plaintiff did not place her deposition into evidence.  (*See* R. 61 at Page ID 814).  To be sure, Plaintiff did initially file the wrong transcript in the record in support of her Response.  (R. 58-17, Deposition labelled "Exhibit 17: Goodrich replace Heather"; *see also* R. 62, Notice filing explaining mistake).  But Plaintiff cited to her deposition in her Response.  (*See, e.g.*, R. 58 at Page ID 438, 455).  And Plaintiff filed a transcript of the deposition in the record the day after filing her Response. (*See* R. 59).  Thus, Defendants were aware that Plaintiff intended to place Plaintiff's deposition in the record

were "on the front porch and saw what happened. They also started running towards the scene and screaming which is understandable for what they just witnessed." (R. 53-2 at Page ID 356). He later testified that the children were out in the yard around the time the Troopers started life-saving measures. (R. 58-1 at Page ID 474). Trooper Lusk stated in his CIRT interview that the kids might have seen the incident take place because immediately after the shots were fired, they ran off the porch and he told Plaintiff to go put the kids inside. (R. 53-3 at Page ID 399-400, 407). Trooper Lusk later testified that he could not recall where the children were located during the shooting but that he remembers them screaming after the shots. (R. 58-8 at Page ID 503).

There is also disagreement about the manner in which Bressler held the sword.[7] In his CIRT interview, Trooper Holt stated that Bressler had his elbow at a 90-degree angle such that the hilt of the sword was pointed toward the ground and the tip was pointed toward the sky. (*See* R. 53-2 at Page ID 369-70). Trooper Holt confirmed during his CIRT interview and his deposition that Bressler did not raise the sword above his head. (*Id.* at Page ID 375; *see* R. 58-1 at Page ID 472) ("Q. So he never raised [the sword] over his head? A. No, sir. Q. You're certain of that? A. Yes, sir."). On the other hand, Trooper Lusk stated in his CIRT interview that Bressler initially had the sword "down to his side" with the pointed end facing downward, but that he later raised it "up in the air" when he was walking toward the Troopers such that the tip of the sword was pointed toward the sky. (R. 53-3 at Page ID 410). Trooper Lusk later testified that Bressler raised the sword above

---

in support of Plaintiff's Response. And the transcript of Plaintiff's deposition confirms that counsel for Defendants requested an electronic copy of the transcript from the court reporter. (*See* R. 58-20 at Page ID 828). Even if defense counsel did not receive a copy of the transcript from the court reporter, Plaintiff filed a copy of the transcript in the record in a timely fashion such that Defendants could address it in their Reply. Defendants have simply chosen to disregard Plaintiff's deposition testimony.

[7] Relatedly, there is some evidence in the record that during the incident Bressler may have briefly raised his left hand with the palm facing forward as if he was waving at the Troopers. (*See* R. 53-2 at Page ID 366, 375; R. 53-3 at Page ID 411; R. 58-1 at Page ID 473; R. 58-8 at Page ID 502). Defendant Troopers do not mention that factual possibility in their Motion (*see* R. 53) or Reply (*see* R. 61), nor do they argue that Bressler's supposed wave contributed to the reasonableness of their use of deadly force.

his head while he walked toward the Troopers.  (R. 58-8 at Page ID 503).  Contrary to the Defendant Troopers' accounts, Plaintiff stated in her CIRT interview that her husband "just had [the sword] in hand" and that "he wasn't threatening anybody with it."  (R. 58-9 at Page ID 570).  She later testified that her husband had the sword pointed toward the ground during the entire incident.  (R. 58-20 at Page ID 826-27).  Plaintiff and some of her children also submitted Affidavits disagreeing with both Troopers' versions.  According to Plaintiff, "[d]uring the entire incident, Gary never raised his sword. He always carried it with the sharp tip pointed at the ground and his hand to his side."  (R. 58-4 at ¶ 3).  As two of the Bressler children recall, their father "was in the street holding a sword to his side" and "[t]he sharp side was pointed in the ground."  (R. 58-5 at ¶ 2; R. 58-7 at ¶ 2).  The third child remembers that her father "never raised the sword higher than . . . past his waist."  (R. 58-6 at ¶ 2).

The parties quarrel about how close Bressler got to the Troopers and whether he ever stopped approaching the Troopers prior to being shot.  In his CIRT interview, Trooper Holt stated that Bressler was initially "maybe 30, 40" feet away from the Troopers, that he "continued to walk the entire time," and that he did not "pause or stop."  (R. 53-2 at Page ID 370).  According to Trooper Holt, Bressler had enough time to "walk maybe a couple hundred feet" and ultimately got within 6 to 7 feet, "at the most, 10 feet away" when he fired his only shot.  (*Id*. at Page ID 355, 375; *see id*. at Page ID 365, 372; *see also* R. 58-1 at Page ID 473).  Trooper Lusk stated in his CIRT interview that Bressler was initially "20, 25 feet" away from the Troopers when he first arrived, but that Bressler advanced to "less than 10 feet away" when shots were fired.  (R. 53-3 at Page ID 404; *see id*. at Page ID 399).  He later testified that he could not recall whether Bressler stopped walking during the incident, but that Bressler got within 10 feet of the Troopers.  (R. 58-8 at Page ID 502-04).  Contrary to the Troopers' accounts, Plaintiff claimed in her CIRT interview that her husband stopped approaching the Troopers and was "just standing there."  (R. 58-9 at Page ID 565).  She

later testified that her husband was just standing in the driveway.  (R. 58-20 at Page ID 826-27). Plaintiff and some of her children submitted Affidavits in support of Plaintiff's Response, describing their recollection of the distance between the Troopers and Bressler when he was shot.  Plaintiff states that the Troopers were "at least 20 feet" from her husband when they shot him.  (R. 58-4 at ¶ 5).  One child states that her father had "stopped a good distance from the police."  (R. 58-5 at ¶ 3). She clarifies that since the time of the shooting she has "gone back and paced the distance between where [her] father was and where the officers were and it was 6 to 8 steps," such that her father "would have to run to be able to reach where the officers were."  (*Id*. at ¶ 7).  Another child similarly states that his father "stopped a good distance from the police," and provides a "best estimate" that his father and the Troopers were "at least 60 feet apart when he was shot."  (R. 58-6 at ¶ 3-4).  The last child provides a "best estimate" that the Troopers were "at least 30 feet away from [his] dad when he was shot" and that his dad "could not have reached the officers."  (R. 58-7 at ¶ 4).  He clarifies that contrary to the distance of "40 to 50 meters" that he provided in his interview with police, he now believes that "the distance of at least 30 feet is more accurate."  (*Id*. at ¶ 7).

The parties disagree about how the Troopers were positioned when they shot Bressler.  In both his CIRT interview and his deposition, Trooper Holt stated that he advanced to the rear of his vehicle (which was facing Bressler) and stood next to the bumper during the incident.  (R. 53-2 at Page ID 362-63; R. 58-1 at Page ID 471).  Trooper Lusk testified that he stayed between the two vehicles, but that he could not recall whether he stood behind the vehicle or the door for cover.  (R. 58-8 at Page ID 501).  On the other hand, Plaintiff and her children each recall the Troopers standing next to or behind the open doors of their cruisers.  (R. 58-4 at ¶ 5 (behind doors); R. 58-6 at ¶ 4 (same); R. 58-7 at ¶ 4 (same); R. 58-5 at ¶ 4 (next to doors)).

Finally, the parties disagree about whether Plaintiff interposed prior to the shots being fired. Both Troopers claim that Plaintiff ran from the front yard and stood in between Bressler and the

Troopers.  (R. 53-2 at Page ID 355, 363, 370; R. 53-3 at Page ID 399, 403; R. 58-1 at Page ID 472;

R. 58-8 at Page ID 502).  Trooper Holt stated in his CIRT interview and in his deposition that he

recalled grabbing Plaintiff with his open hand and pushing her back behind the Troopers to get her

out of the way.  (R. 53-2 at Page ID 355, 363; R. 58-1 at Page ID 472-73).  Plaintiff maintains,

however, that she remained in the front yard and away from the Troopers during the incident and

that she only approached the Troopers *after* her husband was shot and in order to assist with life-

saving measures.  (R. 58-9 at Page ID 568-69; R. 58-20 at Page ID 827; *see* R. 58 at Page ID 439-

40).

The immediate aftermath of the shooting is largely undisputed.  (R. 58 at Page ID 441-46;

R. 61 at Page ID 815-16).  The Troopers called for paramedics and approached Bressler to begin

life-saving measures.  Bressler had fallen to the ground with the sword still in his hand.  (R. 53-2 at

Page ID 356; R. 53-3 at Page ID 399).  Trooper Lusk moved the sword away from Bressler and

closer to the cruisers.  (R. 53-2 at Page ID 356; R. 53-3 at Page ID 400; R. 58-8 at Page ID 505).

He claims to have done so to make sure neither Bressler nor Plaintiff could get hold of the sword.

(R. 53-3 at Page ID 400; R. 58-1 at Page ID 475-76).[8]  The Troopers then had Plaintiff assist with

life-saving measures by providing mouth-to-mouth breathing.  (R. 53-2 at Page ID 357; R. 53-3 at

Page ID 400).  At some point after the shooting, one of the Troopers moved both cruisers from

---

[8] In their Reply, Defendant Troopers agree that the sword was moved away from Bressler but argue
that "[w]hat happened to the sword after Mr. Bressler was shot is entirely immaterial to the question of
justification."  (R. 61 at Page ID 815-16).  Events that occur after a particular use of force are generally
irrelevant to the objective reasonableness of the force.  *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397,
406 (6th Cir. 2007) (discussing the segmented analysis in excessive force cases).  But, as Plaintiff notes in
her Response, the CIRT Supplementary Report depicts a 21-foot circle centered on the sword's location, but
the digital scans and measurements were taken *after* the sword was moved closer to the cruisers.  (R. 58 at
Page ID 443; *see* R. 58-10 at Page ID 653; *see also* R. 58-11 at Page ID 677-78).  The Defendant Troopers'
bullet casings and cruisers are located outside the 21-foot circle depicted in the CIRT Supplementary Report,
and a reasonable juror could conclude that there may have been even greater distance from where Bressler
and the sword fell based on the undisputed fact that the Troopers moved the sword, particularly when Trooper
Holt clarified that the sword was moved *closer* to the cruisers.

where they were located.  (R. 53-2 at Page ID 357; R. 53-3 at Page ID 399-401).  The Troopers claim that they were told to move the cruisers in case the emergency services needed room to get to and from the scene.  (R. 58-1 at Page ID 475; R. 58-8 at Page ID 506-07).  The EMT and paramedic testified that they could not recall telling the officers to move their cruisers, nor was it likely that they would have done so because the cruisers were not blocking the route between the scene and the hospital.  (R. 58-12 at Page ID 705-06; R. 58-13 at Page ID 719).  Based on the diagrams the Troopers created during their investigative interviews, it appears the vehicles were moved between 10 to 20 feet away from where Bressler ultimately fell.  (*Compare* R. 58-2 and R. 58-3 *with* R. 58-10 at Page ID 653).

The emergency service providers placed Bressler in the ambulance and left the scene.  (R. 53-2 at Page ID 357; R. 53-3 at Page ID 400).  Bressler was pronounced dead while in route to the hospital.  (R. 58-12 at Page ID 703; R. 58-18 at Page ID 771).  The autopsy report shows that Bressler had seven entrance-exit gunshot wounds, consistent with the Troopers' accounts.  (*See* R. 58-14).  Dr. Maines testified that four of the bullet wounds had a downward trajectory (*see* R. 58-15), which Plaintiff claims is indicative of Bressler being shot while falling to the ground (*see* R. 58 at Page ID 446-48).

### B.    Procedural Background

On March 17, 2022, Plaintiff filed a Complaint against Defendant Troopers, alleging (I) violation of Gary Bressler's rights under the Fourth Amendment (excessive force) pursuant to 42 U.S.C. § 1983; (II) common law assault and battery; (III) wrongful death; (IV) intentional infliction of emotional distress; and (V) negligent infliction of emotional distress.  (*See* R. 1).  After discovery closed, Defendants timely filed the instant Motion for Summary Judgment.  (R. 53).  Plaintiff filed a Response (R. 58), opposing summary judgment on the excessive force, assault and battery, and wrongful death claims but withdrawing the claims for intentional infliction of emotional distress

and negligent infliction of emotional distress.[9]  Defendants filed a Reply (R. 61).  Thus, the Motion for Summary Judgment is ripe for review.[10]

## II.   STANDARD OF REVIEW

Federal Civil Rule 56 governs motions for summary judgment.  "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Payne v. Novartis Pharm. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(a), (c)).  "The moving party bears the burden of showing that no genuine issues of material fact exist."  *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 516-17 (6th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986)).  In deciding a motion for summary judgment, the Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  At this stage, it is not the Court's job to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.  *McGuire v. Michigan Dep't of Cmty. Health*, 526 F. App'x 494, 497 (6th Cir. 2013).  "If conflicting testimony appears in affidavits and depositions that are filed, summary judgment may be inappropriate as the issues involved will depend on the credibility of the witnesses."  *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013) (citations removed).  Still, plausible allegations are not enough to defeat a properly supported summary judgment motion.  "The nonmoving party must set forth *sufficient specific* evidence to permit a fair-minded jury to return a verdict in its favor."  *Mount v. United States Postal Serv.*, 79 F.3d 531, 533 (6th Cir. 1996) (emphasis added).  "The

---

[9] Plaintiff also filed a Motion for Leave to Exceed Page Limit for its Response (R. 57), which will be granted.

[10] Relatedly, Plaintiff filed a Motion in Limine to exclude certain expert testimony from trial.  (R. 52).  That Motion will be addressed in a separate order.

ultimate question is whether the evidence presents a sufficient disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne*, 767 F.3d at 530 (citing *Anderson*, 477 U.S. at 255).

## III.   ANALYSIS

As noted previously, Plaintiff has agreed to withdraw the state law claims for intentional infliction of emotional distress and negligent infliction of emotional distress.  (*See* R. 58 at Page ID 463).  Therefore, Defendants' Motion for Summary Judgment will be granted with respect to those claims.  As for the remaining claims, the Court turns first to the federal claim for excessive force, then to the state law claims for assault, battery, and wrongful death.

### A.   Excessive Force under the Fourth Amendment

Plaintiff claims that Defendant Troopers violated the Fourth Amendment by using excessive force.  Defendants seek summary judgment on this claim, asserting that they are entitled to qualified immunity.  (*See* R. 53-1 at 317-19, 325-28).  Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Thus, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established."  *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  "Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity."  *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (citation omitted).  "That is, although on summary judgment this Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party, when a defendant raises the defense of qualified immunity in a

12

motion for summary judgment, the plaintiff must show that those facts and inferences would allow a reasonable juror to conclude that the defendant violated a clearly established constitutional right." *Williams v. Maurer*, 9 F.4th 416, 431 (6th Cir. 2021). "If a reasonable jury could credit the plaintiff's version of events and if that version clearly shows the excessive nature of the defendants' force, [courts] cannot grant the officers summary judgment." *Gambrel v. Knox County, Kentucky*, 25 F.4th 391, 400 (6th Cir. 2022).

### 1.    Constitutional Violation

"The Fourth Amendment's prohibition against unreasonable seizures protects citizens from excessive use of force by law enforcement officers." *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015); *see Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (observing that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment"). Under this standard, a court considers whether "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). That is, the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight." *Id*. at 396. And the inquiry must account for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396-97. Nevertheless, "the fact that a situation unfolds relatively quickly 'does not, by itself, permit [officers] to use deadly force.'" *Estate of Kirby v. Duva*, 530 F.3d 475, 483 (6th Cir. 2008) (quoting *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)) (alteration in *Kirby*).

The Supreme Court has articulated three factors to consider in evaluating whether a particular use of force was excessive: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is

actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see Kisela v. Hughes*, 584 U.S. 100, 103 (2018).   Ultimately, the reasonableness of a particular use of force depends on the "totality of the circumstances." *Roell v. Hamilton Cnty.*, 870 F.3d 471, 480 (6th Cir. 2017).   That said, the inquiry is limited "to the facts that were knowable to the defendant officer[s]." *Reich v. City of Elizabethtown*, 945 F.3d 968, 979 (6th Cir. 2019) (quoting *White v. Pauly*, 580 U.S. 73, 76-77 (2017)).

Defendant Troopers give short shrift to the first and third *Graham* factors, arguing only that they had probable cause to believe that Bressler posed an immediate threat of safety to the Troopers. (*See* R. 53-1 at Page ID 318-19; R. 61 at Page ID 816-17).   For her part, Plaintiff argues that the Troopers were not responding to a report of a crime and have not asserted that Bressler was resisting arrest or attempting to flee.   (*See* R. 58 at Page ID 449).

In this case, the first and third *Graham* factors sit in equipoise.   It is undisputed that the Troopers were not responding to a report of a crime.   Although the parties may quibble about how Bressler's initial 911 call was (or should have been) interpreted by law enforcement, they do not dispute what Bressler said (or did not say) during that call.   There was no report of crime; Bressler simply requested law enforcement to respond to his home and hung up.   Neither was there mention of a crime in Plaintiff's follow-up call.   If anything, some evidence in the record suggests that Bressler may have been experiencing an emotional episode, *see* note 3 *supra*, though a jury need not make that determination to reasonably conclude that no crime was ever reported.

It is also undisputed that Bressler refused to drop the sword in defiance of the Troopers' commands to do so.   A reasonable juror could conclude that Bressler's refusal to drop the sword in defiance of the Troopers' commands amounted to active resistance. *Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 612 (6th Cir. 2020) (defining "active resistance" as "some outward manifestation—either verbal or physical—on the part of the suspect [suggesting] volitional or

14

conscious defiance").  To be sure, the Sixth Circuit has also held that "noncompliance alone does not indicate active resistance; there must be something more."  *Id*. (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013)).  However, under Plaintiff's version of the events, Bressler did in fact comply with the Troopers' orders to halt.  That is, a reasonable juror could conclude that Bressler's choice to comply with the Troopers' orders to halt, but not with the Troopers' orders to drop the sword, was a volitional or conscious choice to defy the latter.[11]

That leaves the second *Graham* factor, whether Bressler posed "an immediate threat to the safety" of the Troopers.  *Graham*, 490 U.S. at 396.  Importantly, the use of *deadly* force is unreasonable unless the officer "has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  *Garner*, 471 U.S. at 3.  That is, *Graham*'s second factor is "a minimum requirement for the use of deadly force."  *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019) (quotations and citations omitted).  "Given the extreme intrusion caused by the use of deadly force, the countervailing governmental interests must be weighty indeed; 'only in rare instances may an officer seize a suspect by use of deadly force.'"  *Davenport v. Causey*, 521 F.3d 544, 551 (6th Cir. 2008) (quoting *Whitlow v. City of Louisville*, 39 F. App'x 297, 302-03 (6th Cir. 2002)).

Under Plaintiff's version of the events, a reasonable juror could conclude that Bressler did not pose an immediate threat to the Troopers and that their use of deadly force was therefore

---

[11] Plaintiff suggests that the Court should look to additional factors that the Sixth Circuit has considered in evaluating an officer's use of force when responding to a medical emergency.  (R. 58 at Page ID 449) (citing *Palma v. Johns*, 27 F.4th 419, 429 (6th Cir. 2022); *see Estate of Hill v. Miracle*, 853 F.3d 306, 313-14 (6th Cir. 2017) (establishing a "more tailored set of factors" for evaluating an officer's use of force in the "medical-emergency context," i.e., a situation that "does not fit within the *Graham* test because the person in question has not committed a crime, is not resisting arrest, and is not directly threatening the officer").  The Court at this time declines to consider this altered set of factors in light of the fact that a reasonable juror could conclude that Bressler's refusal to drop the sword amounted to active resistance.  *See Reich*, 945 F.3d at 979 n.4 (declining to address *Estate of Hill*'s medical-emergency factors because the situation "plainly" fit within the *Graham* factors).

objectively unreasonable.  When viewing the facts in the light most favorable to Plaintiff, the circumstances unfolded as follows.  After the Troopers arrived on the scene and exited their cruisers, they stood behind or near the cover of the open doors of their vehicles.  Bressler walked toward the Troopers at a steady pace but came to a stop somewhere between 20 and 60 feet from the Troopers, in apparent compliance with their orders.  He kept the sword pointed toward the ground in a nonthreatening manner during the entire incident.  He did not make any threatening movements toward the Troopers, nor did he verbally threaten the Troopers in any way.  In response to these nonthreatening behaviors, the Troopers fired seven shots, killing Bressler.[12]

Under this set of facts, a reasonable juror could conclude that Bressler did not pose an immediate threat to the Troopers and their use of deadly force was objectively unreasonable.  For starters, the Sixth Circuit has held that mere possession of a weapon does not justify the use of deadly force: "even when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is *not* justified." *Bouggess v. Mattingly*, 482 F.3d 886, 896 (6th Cir. 2007).  That is, even when a suspect possesses a weapon, there must be "additional indicia that the safety of the officers or others is at risk" in order

---

[12] The Court utilizes the range of distances asserted in the Bressler family's Affidavits.  Defendants have not challenged Plaintiff's submission of the Affidavits.  *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").  Nor have Defendants argued that the statements in the Affidavits are directly inconsistent with statements made prior to the litigation so as to implicate the "sham-affidavit rule." *Gambrel v. Knox County, Kentucky*, 25 F.4th 391, 404 (6th Cir. 2022) (citing *Reich v. City of Elizabethtown*, 945 F.3d 968, 976-77 (6th Cir. 2019)).  Indeed, Defendant Troopers agree that it would be improper at this stage for the Court to weigh the credibility of each submission and choose among the distances espoused in the Affidavits.  (R. 61 at Page ID 813) (noting that "it would be a waste of the Court's time for the Defendants to argue credibility" concerning the children's version of the events because, at this stage, "the Court is required to accept the Plaintiff's version").  Even without the Affidavits, there is some indication in the record that the bullet casings were located more than 21 feet away from the sword, which had been moved *closer* to the police cruisers after the fact.  (*See* R. 58 at Page ID 443-44).  Suffice it to say that Plaintiff has provided sufficient specific evidence concerning the distances between the Troopers and Bressler such that a reasonable juror could agree with her version of the events.

to use deadly force.  *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 480 (6th Cir 2022).

Here, Bressler did little to nothing beyond possessing a deadly weapon to otherwise pose a threat to

the Troopers.  True, he initially approached the Troopers and may have gotten within as little as 20

feet of the Troopers under Plaintiff's version of the facts.  But even in combination with possessing

the sword, Bressler's 20-foot proximity to the Troopers does not justify their use of deadly force

under the circumstances.  *Compare Zulock v. Shures*, 441 F. App'x 294, 302 (6th Cir. 2010)

(unreasonable to shoot man armed with a knife when officers were eighteen to twenty feet away,

despite speed of the encounter) *with Rucinski v. Cnty. of Oakland*, 655 F. App'x 338, 342 (6th Cir.

2016) (reasonable to shoot man who approached officer and got within five feet while wielding a

knife).  This is particularly true when, under Plaintiff's reasonably supported version of the events,

Bressler held the sword in a nonthreatening manner, approached the Troopers at a steady rather than

quick pace, and came to a complete stop.  *Chappell v. City of Cleveland*, 585 F.3d 901, 915 (6th Cir.

2009) (finding it was the knife-wielding suspect's "actions of *quickly* advancing toward the officers

*while holding the knife up* and refusing to drop it that precipitated their use of deadly force")

(emphasis added); *Rhodes v. McDannel*, 945 F.2d 117, 118 (6th Cir. 1991) (finding deadly force

reasonable where, immediately before the officer shot, the suspect had "advanced within a distance

of four to six feet with [a] machete raised"); *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763,

776 (6th Cir. 2004) (finding lethal force reasonable where the suspect "had not only extended the

blade of his knife but had attacked [an officer] with it"); *Studdard v. Shelby Cnty., Tennessee*, 934

F.3d 478, 483 (6th Cir. 2019) ("There is a world of difference between a knife-wielding suspect

who runs at officers and one who doesn't.").

Defendant Troopers resist this conclusion, arguing that their conduct was objectively

reasonable based on *Reich v. City of Elizabethtown*, 945 F.3d 968 (6th Cir. 2019).  (*See* R. 53-1 at

Page ID 319; R. 61 at Page ID 817).  In doing so, however, Defendants rely exclusively on their

subjective view of the facts: "The question is not whether Heather Bressler's most recent version of the facts agrees that the Defendants were in danger, but whether the Troopers would have believed they were in danger <u>from their perspective</u>."  (R. 61 at Page ID 813) (emphasis in original); (*see id*. at Page ID 816) ("Both Defendants have said that, *from their perspective* at the moment before they shot, they believed they were in danger because Gary Bressler was coming toward them with his sword.") (emphasis added).  "But just because [courts] must look at the circumstances through the eyes of a reasonable officer does not mean . . . that [courts] must accept the officers' subjective view of the facts when making this assessment."  *Jacobs*, 915 F.3d at 1041.  That is, the Troopers' subjective beliefs do not rule the day; the Supreme Court has made clear that the inquiry is an objective one.  *Graham*, 490 U.S. at 397.  And at this stage, the Court must view the facts and draw all reasonable inferences in favor of Plaintiff.  *Gambrel*, 25 F.4th at 400; *see England v. City of Columbus, Ohio*, No. 22-3055, 2023 WL 3756177, at *4-5 (6th Cir. June 1, 2023) (denying qualified immunity because defendants' arguments "improperly 'rest[ed] . . . on their own version of the disputed facts and inferences they would draw from them.'") (quoting *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 611 (6th Cir. 2015)).

In addition, Defendants contend that the location of the Troopers is irrelevant because they had "no duty to retreat."  (R. 61 at Page ID 814) (quoting *Stewart v. City of Euclid, Ohio*, 970 F.3d 667, 673 (6th Cir. 2020)).  To be sure, an officer is generally not precluded from using deadly force even if his own "poor planning or bad tactics" unnecessarily escalated the situation.  *Reich*, 945 F.3d at 978 (citing *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007)).  However, "[s]ometimes, the time or space available to an officer may mean that the reasonable thing to do is monitor the suspect, issue a warning, or take cover."  *Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 366-67 (6th Cir. 2017) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir. 1996) and then *Brandenburg v. Cureton*, 882 F.2d 211, 213 (6th Cir. 1989)).  Indeed, in stating that the

Troopers had no duty to retreat, Defendants conveniently omit the full quotation from the cited case: "But having no duty to retreat does not mean [the officer] could use deadly force; his actions must still be reasonable under the circumstances." *Stewart*, 970 F.3d at 673. In fact, Trooper Holt testified that he could have taken cover and that there was nothing preventing him from backing away while talking to Bressler. (R. 58-1 at Page ID 471-72). And Plaintiff's expert indicates that under the circumstances presented to the Troopers, the generally accepted law enforcement practice would be to take a position of cover and create separation if they reasonably believed that Bressler could cause harm. (R. 58-19 at Page ID 793). At the very least, whether the Troopers had an opportunity to retreat or otherwise deescalate the situation is a relevant and material consideration for a jury in determining whether the Troopers' use of deadly force was reasonable under the circumstances. *Chappell*, 585 F.3d at 911 (finding no violation when the "knife-wielding suspect was undisputedly moving toward the officers and had closed to within five to seven feet in a dark, cluttered enclosed space" and the officers "were backed up against a wall in the small bedroom and there was no ready means of retreat or escape"); *Hicks v. Scott*, 958 F.3d 421, 436 (6th Cir. 2020) (finding threat perceived by officer was compounded by "lack of a viable escape route"); *Palma v. Johns*, 27 F.4th 419, 439 (6th Cir. 2022) (noting that depending on the severity and immediacy of the potential threat, it may be appropriate for an officer to retreat or await for backup) (citing *Johnson v. City of Philadelphia*, 837 F.3d 343, 353 (3d Cir. 2016)); *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (finding use of force unreasonable in light of *inter alia* police-practices expert testimony about available de-escalation tactics).

Putting aside whether the Troopers were located next to or behind the doors of their vehicles, Plaintiff's version of the events still stands in stark contrast to the factual circumstances at issue in *Reich*. There, the undisputed facts established that,

both officers saw Blough wielding a knife, shirtless, pacing back and forth between houses in the neighborhood. They both knew that he had severe schizophrenia, had not been taking his medication, disliked the police, and thought "everybody [was] out to get him." After the officers exited their vehicles, Blough walked at a fast pace toward the officers with the knife in his right hand and refused Reich's pleas to drop the knife and return to her vehicle. Both officers stayed near their vehicles, never moving toward Blough.

When both officers then commanded—at least once each—that Blough drop the knife, he again did not. Instead, Blough "took a step forward toward" [Officer] Richardson with his knife raised in his right hand in a stabbing position and said, "you're gonna have to kill me mother * * * *er." That prompted officers to fire three rapid shots in a single volley—the first two by [Officer] Richardson, the last by [Officer] McMillen—with Blough having advanced within six to twelve feet of Officer Richardson.

*Reich*, 945 F.3d at 979.  In this case, the Troopers were not aware of any propensity of Bressler's to dislike the police.  Bressler approached the Troopers at a steady, rather than fast, pace and halted at least 20 feet away in compliance with their orders.  Rather than raising the sword or holding it in a stabbing position, Bressler kept the tip of the sword pointed toward the ground in a non-threatening manner.  Bressler never said a word, let alone invite the Troopers to kill him.  Put simply, *Reich* is factually different in several significant ways.

To be sure, the Sixth Circuit acknowledged in *Reich* that "[a]n assailant can close [a 25 to 36 foot] distance in a second or two," and that "[t]here is no rule that officers must wait until a suspect is literally within striking range, risking their own and others' lives, before resorting to deadly force."  945 F.3d at 982.  But as noted previously, other Sixth Circuit precedent makes clear that possession of a deadly weapon alone does not justify deadly force; there must be additional indicia that the safety of the officers or others is at risk.  *Bouggess*, 482 F.3d at 896; *Campbell*, 47 F.4th at 480.  And the Court in *Reich* expressly relied on such additional indicia in finding that the officers' use of force was objectively reasonable:

If Reich's affidavit were credited, Blough would still be a knife-wielding belligerent who (as the officers knew) disliked the police, had "real bad" schizophrenia, and was not taking his medications. He would still have ignored the officers' demands that he

> drop the knife. He would still have advanced toward them with his knife hand raised in a stabbing position. And he would still have announced—moments before the shooting—"you're gonna have to kill me mother * * * *er."
>
> The only change the affidavit would make is to place Blough some twenty feet farther away from the officers.

*Reich*, 945 F.3d at 982.  As discussed, under Plaintiff's version of the events, the Troopers were not aware of any diagnosed mental health disorder; the Troopers were not aware of any tendency to dislike police; Bressler was not belligerent; Bressler came to a complete stop; Bressler held the sword in a non-threatening manner; and Bressler never made any verbal threats.  Bressler simply was not behaving like the decedent in *Reich*.

The circumstances, as Plaintiff alleges them, more closely resemble the facts at issue in *Lee v. Russ*, 33 F.4th 860 (6th Cir. 2022).  There, Officers David Russ and Jason Lee responded to a 911 call that a man carrying a large knife, Randy Groom, had robbed a local Rite Aid.  *Id.* at 862.  Officer Russ had some familiarity with Groom as a local resident.  *Id.*  The officers spotted Groom walking along an access road in a shopping center parking lot and approached.  *Id.*  Officer Russ announced himself and told Groom they needed to talk.  *Id.*  In response, Groom "reached for his waistband, lifted his shirt, and pulled a large knife out of a sheath in his shorts," stating, "'Not today, David.'"  *Id.*  The officers drew their firearms and commanded Groom to drop the knife.  *Id.*  Groom ignored several commands and started walking toward Officer Russ, who stood next to his vehicle.  *Id.*  Groom told Officer Russ to shoot him, repeating himself at least five times.  *Id.*  Officer Lee testified that, at first, Groom was "being very belligerent" and "yelling," but that he appeared to de-escalate the situation because he stopped walking and eventually stopped waving the knife, instead holding it at waist height.  *Id.*  After about 20 seconds, Groom took another step, holding the knife near his waist.  *Id.*  The parties disputed whether Groom stepped toward the officers or stepped sideways.  *Id.*  Officer Russ fired a shot, fatally striking Groom in the chest.  *Id.*

The Sixth Circuit concluded that Groom did not pose an imminent and serious risk when Russ fired his weapon:

> Russ, the closest individual, stood near the back of his vehicle 30 feet away. Officer Lee provided cover with his firearm from behind Groom. Aside from telling Russ "[n]ot today" when Russ said they needed to talk, Groom did not make any verbal threats. He stood still for roughly 20 seconds, lowered his knife to waist height, then made one step sideways to Russ. This was not a threatening advance or at least that is what a jury could find on this record. Even so, Russ fired the shot as soon as Groom "began to move." Granted, Russ knew that Groom had robbed a pharmacy. He knew that Groom had unsheathed a knife when the officers confronted him and disregarded commands to drop it. And he knew that Groom had walked to a position 30 feet away and that Groom told Russ to shoot him. But all record facts considered, Groom's actions in the moments before the shooting did not justify lethal force.

*Id*. at 863-64 (citations omitted).  Similar to the decedent in *Lee*, Bressler approached the Troopers, stood somewhere between 20 and 60 feet away, held the sword at his side, and did not make any verbal threats.  Like in *Lee*, a reasonable jury could conclude that Bressler's actions did not constitute a threatening advance.  Indeed, in *Lee* the decedent also made a final movement before being shot.  Here, under the circumstances as Plaintiff alleges them, Bressler was standing in place when he was shot, and any additional steps were taken as a result of him stumbling after being shot.  *See England*, 2023 WL 3756177, at *4 (affirming district court's denial of qualified immunity because, when viewing the facts in the light most favorable to the plaintiff, the decedent "fell forward because of gravity, not because [he] lunged forward").

Lastly, Defendants point to inconsistencies in the record in an effort to undermine Plaintiff's version of the events.  For example, Defendants argue that Dr. Maines's testimony concerning the gunshot wounds suggests that Bressler actually had his arm raised and may have been "bending forward or leaning and/or moving forward, when he was shot."  (R. 61 at Page ID 815).  But as noted previously, Plaintiff submitted evidence suggesting the contrary, including the sworn statements of her family that Bressler did not raise the sword, Trooper Holt's testimony that he was certain Bressler did not raise the sword above his head, and Dr. Maines's testimony and report

22

suggesting that Bressler was shot while he was falling.  At this stage it is not the job of the Court to weigh the evidence and determine the truth of the matter.  *McGuire*, 526 F. App'x at 497.  Instead, the Court must determine whether there is a genuine dispute of material fact.  The Court finds that there is.  Plaintiff has provided sufficient evidence to support her version of events, according to which a reasonable juror could find that Bressler did not pose an immediate threat to the safety of the Troopers and that the Troopers' use of deadly force therefore violated the Fourth Amendment. *Lopez v. City of Cleveland*, 625 F. App'x 742, 746-47 (6th Cir. 2015) (denying qualified immunity due to "contentious factual disputes" about the nature of the suspect's final movements before being shot and whether the suspect raised the machete over his read, rather than keeping it at his side).

## 2.    Clearly Established

Having determined a reasonable juror could conclude that the Troopers' use of deadly force was objectively unreasonable and therefore violated Bressler's Fourth Amendment rights, the Court turns next to whether that right was clearly established at the time of the incident.  In making that determination, the "salient question is whether the state of the law at the time of the incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quotations and alterations omitted).  While the Supreme Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 580 U.S. at 79 (citing *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).  "[S]pecificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix*, 577 U.S. at 12 (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

Defendant Troopers argue that "[a]ny reasonably well-trained officer would have believed that the law allowed him to use deadly force against a man with a sword who was close enough to immediately use deadly force against him."  (R. 53-1 at Page ID 327).  But that is Defendants' version of the facts.  When analyzing the state of the law for purposes of the clearly-established prong, courts must continue to resolve genuine disputes of fact in favor of the non-movant.  *Tolan*, 572 U.S. at 657 ("Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard."); *Lopez*, 625 F. App'x at 747 n.2.  And under Plaintiff's version of the events, Bressler held a sword in a nonthreatening manner and was 20 to 60 feet from the Troopers when he was shot.

In this case, the right not to be fatally shot by police under the circumstances as Plaintiff alleges them was clearly established at the time of the events in question.  It has "been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others."  *Jacobs*, 915 F.3d at 1040 (citing *King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012)); *see Zulock*, 441 F. App'x at 303 (holding as of 2010 that "[t]he right of an individual not to be subjected to the use of deadly force by an officer who lacks probable cause to believe that the individual posed a threat of serious harm to the officer or others has long been clearly established in this circuit"); *see also Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir. 2006) ("It was clearly established law in this circuit at the time of the underlying events that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others.") (citing *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991) and then *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988)).[13]

---

[13] Among other cases, Plaintiff argues that the Sixth Circuit's decision in *Lee v. Russ*, 33 F.4th 860 (6th Cir. 2022) constitutes precedent clearly establishing that the Troopers violated Bressler's Fourth Amendment rights.  However, the Circuit's decision in *Lee* was decided on May 6, 2022, roughly six months after the November 2, 2021, shooting presently at issue.  Cases that postdate the conduct in question cannot

Defendants argue that the legal rule must be identified with a higher degree of specificity and must be particularized to the facts of the case. (*See* R. 53-1 at Page ID 327). "But the Supreme Court has recognized that there are obvious cases in which an officer should have been on notice that his conduct violated constitutional rights, despite the generalized nature of that Court's pronouncements of constitutional standards." *Bouggess*, 482 F.3d at 895 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Indeed, the Sixth Circuit has relied on a general articulation of the *Garner* rule to conclude that a suspect's right not to be shot unless he poses a serious threat to the officer or other person was clearly established "even in situations with diverse factual distinctions." *Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005) (collecting cases).

In any event, to the extent that such a general articulation is insufficient in this case, more specific Sixth Circuit precedent placed the constitutional question beyond debate. Sixth Circuit precedent at the time of the incident clearly established that law enforcement may not use deadly force against a suspect for merely possessing a weapon and that there must be additional indicia of a serious threat of harm. *Bouggess*, 482 F.3d at 896 ("even when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is *not* authorized.") (emphasis in original); *Jacobs*, 915 F.3d at 1040 ("merely possessing a weapon is not enough—the officer must reasonably believe the individual poses a danger of serious physical harm to himself or others to justify deadly force.").[14] This more specific

---

give fair notice and therefore "are of no use in the clearly established inquiry." *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004).

[14] Indeed, *Garner* itself articulated a version of this rule. *Garner*, 471 U.S. at 11 ("Thus, if the suspect threatens the officer with a weapon . . . deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."). The Sixth Circuit has held that even the possession of a *firearm* does not alone justify the use of deadly force and that the reasonableness of an officer's asserted fear will often turn on "whether the armed suspect pointed the firearm at the officer or another person." *Hicks v. Scott*, 958 F.3d 421, 435-36 (6th Cir. 2020). Of course, Bressler did not possess a firearm. But the point remains: officers must point to something other than a suspect's possession of a weapon to justify using deadly force.

articulation of a legal rule is sufficient to move this case "beyond the otherwise hazy border between excessive and acceptable force." *Kisela*, 584 U.S. at 105 (quoting *Mullenix*, 577 U.S. at 18).

When viewing the facts and drawing all reasonable inferences in favor of Plaintiff, Bressler walked toward the Troopers at a steady pace but came to a stop somewhere between 20 and 60 feet from the Troopers, in apparent compliance with their orders; he kept the sword pointed toward the ground in a nonthreatening manner during the entire incident; he did not make any threatening movements toward the Troopers; and he did not verbally threaten the Troopers in any way. In short, Bressler merely possessed a weapon and did not otherwise pose a threat of serious harm to the Troopers. Therefore, the Troopers' use of deadly force under those circumstances violated clearly established law. The Court denies qualified immunity, and the federal excessive force claim survives for jury review.

### B.     State Law Claims

Plaintiff asserts state law claims for assault, battery, and wrongful death.[15] Defendant Troopers do not dispute that they shot Bressler or that their use of force was the cause of his death. (*See* R. 53-1 at Page ID 320). Instead, they seek summary judgment on the state law claims by arguing they are entitled to qualified immunity under Kentucky law. (*See id*. at Page ID 319-21). Under Kentucky law, qualified immunity protects a police officer so long as he performed "(1) discretionary acts or functions . . . ; (2) in good faith; and (3) within the scope of [his] authority."

---

[15] The Court applies substantive Kentucky law to each state claim. *See Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999) ("A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction."). In Kentucky, assault and battery are distinct and independent torts. *Leath v. Webb*, 323 F. Supp. 3d 882, 902 (E.D. Ky. 2018); *Ali v. City of Louisville*, No. 3:05CV-427-R, 2006 WL 2663018, at *4 n.7 (W.D. Ky. Sept. 15, 2006). Though "[a]ssault . . . merely requires the threat of unwanted touching of the victim," "battery requires an actual unwanted touching." *Banks v. Fritsch*, 39 S.W.3d 474, 480 (Ky. Ct. App. 2001). Moreover, "[w]henever the death of a person results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered for the death from the person who caused it. . . ." KRS § 411.130(1); *also see* KRS § 411.133.

*Yanero v. Davis*, 65 S.W.3d 510, 521-22 (Ky. 2001). "The determination of the amount of force required, including the decision to use deadly force, is a discretionary act." *Reich*, 945 F.3d at 982 (citing *Nichols v. Bourbon Cty. Sheriff's Dep't*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014) and then *Marson v. Thomason*, 438 S.W.3d 292, 297 (Ky. 2014)). "And the use of deadly force plainly falls within the scope of a police officer's authority." *Id*. (citing KRS § 503.050(1)-(2) and then *Woosley v. City of Paris*, 591 F. Supp. 2d 913, 922 (E.D. Ky. 2008)).

That leaves the question of whether the Troopers acted in good faith. Though the other steps of the Kentucky qualified immunity analysis are slightly different than the analysis for federal qualified immunity, the good faith step tends to rise or fall with its federal counterpart. *See, e.g.*, *Browning v. Edmonson Cnty., Kentucky*, 18 F.4th 516, 530-31 (6th Cir. 2021) (noting the resolution of the qualified official immunity issue under Kentucky law "turned on" the court's prior determination that the officer violated the suspect's clearly established constitutional rights by using excessive force); *Reich*, 945 F.3d at 983 (noting the analysis of the Fourth Amendment claim "takes care of" the objective good faith analysis for Kentucky qualified immunity); *see also Mills v. Owsley*, 483 F. Supp. 3d 435, 477 (E.D. Ky. 2020) ("The analysis, here, tracks the federal reasoning."); *Fultz v. Whittaker*, 261 F. Supp. 2d 767, 783 (E.D. Ky. 2003) (noting the analysis of Kentucky qualified immunity on assault and battery claims "will be the same as that for qualified immunity" on federal claims). This is because the Kentucky Supreme Court has held that "bad faith can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.*, objective unreasonableness[.]" *Yanero*, 65 S.W.3d at 523. In other words, "[i]f an officer 'knew or reasonably should have known that the action he took would violate a [clearly established] right of the plaintiff, bad faith may be found to exist." *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 485-86 (Ky. 2006) (quoting *Yanero*, 65 S.W.3d at 523); *Mills*, 483 F.

27

Supp. 3d at 477 (finding that reasonable juror could conclude the officer violated a clearly established right, which "equate[s] to bad faith, for state immunity purposes").

Under the circumstances as Plaintiff alleges them, a reasonable juror could find, for the reasons previously discussed in this opinion, that the Troopers' use of deadly force was objectively unreasonable and thus excessive, constituting claims for assault and battery under Kentucky law. *Browning*, 18 F.4th at 531 (quoting *Ali*, 2006 WL 2663018, at *8) ("The use of excessive force by a police officer constitutes the intentional tort of battery."); *Fultz*, 261 F. Supp. 2d at 783 ("An officer making an arrest may use such force as may be necessary to make the arrest but no more.") (citing *City of Lexington v. Gray*, 499 S.W.2d 72, 74 (Ky. 1973)); *Leath*, 323 F. Supp. 3d at 902-03 (denying Kentucky qualified immunity on assault and battery claims based on officer's use of excessive force in violation of clearly established law).  The same conclusion applies with respect to the wrongful death claim.  *See Casey v. Sanders*, No. 7:17-CV-145-KKC, 2018 WL 3078758, at *8-9 (noting wrongful death claim can proceed under battery theory or negligence theory).  A reasonable juror could similarly find that Bressler's right to be free from deadly force, under the circumstances as Plaintiff alleges them, was clearly established at the time of the underlying events, equating to bad faith.  Therefore, the Troopers are denied qualified immunity under Kentucky law, and the state law claims survive for jury review.

## IV.    CONCLUSION

For the reasons stated herein, **IT IS HEREBY ORDERED** as follows:

1)      Plaintiff's Motion for Leave to Exceed Page Limit (R. 57) is **GRANTED**; and

2)      Defendants' Motion for Summary Judgment (R. 53) is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's claims of intentional infliction of emotional distress and negligent infliction of emotional distress are **DISMISSED** as withdrawn, but all other claims remain.

Signed this 30th day of September, 2024.



Signed By:

_Candace J. Smith_

United States Magistrate Judge

G:\Judge-CJS\DATA\Orders\civil cov\2022\22-35-CJS MOO gip dip #53.docx